Stearns Magnetic Manufacturing Company v. Commissioner. Roswell N. Stearns v. Commissioner. Roswell H. Stearns v. Commissioner.
Stearns Magnetic Mfg. Co. v. Commissioner
Docket Nos. 23509, 23511, 23512.
United States Tax Court
1952 Tax Ct. Memo LEXIS 197; 11 T.C.M. (CCH) 535; T.C.M. (RIA) 52160; May 29, 1952
*197 Edmund B. Shea, Esq., 735 N. Water St., Milwaukee, Wis., and Percy W. Phillips, Esq., for the petitioners. Harold H. Hart, Esq., for the respondent. MURDOCK
Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies as follows: Declared value
Excess
Doc. No.
Year
excess-profits tax
profits tax
Stearns Magnetic Manufacturing Co.
23509
1943
$ 5,332.69
$39,221.18
1944
4,435.55
44,224.34
1945
60,149.29
Income tax
Roswell N. Stearns
23511
1943
$223,566.78
1944
4,817.43
1945
7,335.77
Roswell H. Stearns
23512
1943
221,851.61
1944
3,624.77
1945
5,687.29 One issue for decision is whether a transfer of a patent by a corporation to its two sole stockholders, with a concurrent license from the stockholders to the corporation permitting it to continue to use the patent in its business upon payment to the stockholders of 10 per cent of its gross sales of the patented article, was effective for income tax purposes so that the amounts paid its sole stockholders for use of the patent were deductible as ordinary and necessary expenses. Other issues dealt with by *198 the parties in their briefs are the value of the patent, at the time it was transferred to the stockholders, to be taxed as a dividend and the reasonableness of the "royalties". The Commissioner states in effect that he waives his contentions under these issues if he is sustained on the first issue. Findings of Fact Stearns Magnetic Manufacturing Company, hereafter called the corporation, was incorporated under the laws of Wisconsin in 1916. The returns of the petitioners for the taxable years were filed with the collector of internal revenue for the district of Wisconsin. The individual petitioners, father and son, are the sole officers and directors of the corporation and each owned substantially one-half of its stock at all times material hereto. An employee of the corporation developed an invention for an automatic magnetic brake in the course of his employment and applied for a patent thereon. His application was assigned to the corporation and a patent was issued in its name on November 3, 1936. The patent was carried on the corporate books at no cost. The corporation commenced manufacturing and selling brakes under the patent, but in 1938 arranged to have the brakes *199 manufactured by Fritzke & Icke, Inc., at less cost to the corporation than it could manufacture them. Thereafter, Fritzke & Icke, Inc. manufactured the brakes and the corporation sold them at all times material hereto. The two individual petitioners purchased all of the stock of Fritzke & Icke, Inc. on December 26, 1945. The corporation was engaged in the manufacture and sale of electrical machinery and equipment. Most of the items manufactured were relatively large and were made to order for each purchaser. The magnetic brakes which it sold were furnished in a number of different sizes, all relatively small, which could be manufactured on a mass production basis. The magnetic brake sales were about 38.4 per cent of the total sales of the corporation for the years 1939 through 1945. The net income of the corporation for the years 1929 through 1941 ranged from losses in 1932 and 1933 to $18,839.66 in 1941. Its net income for 1942 was $73,694.27. The corporation paid cash dividends in 1929, 1930, 1931, 1934, 1936 and 1941 ranging from $2,775 in 1934 to $6,000 in 1941. The total cash dividends for the period 1929 through 1943 amounted to $27,537. The gross sales under the patent *200 increased from about $23,000 in 1937 to about $106,000 in 1940, but those sales resulted in losses totaling about $19,000 for those four years. Thereafter the sales increased steadily from about $235,000 in 1941 to about $590,000 in 1947, and the net profits for that period increased from about $6,000 in 1941 to about $149,000 in 1947, before deducting from the latter figure the 10 per cent of gross sales paid to the stockholders. The gross sales for 1942 were $366,545.85 and the net profit for that year was $29,701.64. The gross sales for January and February 1943 were $32,395.89 and $34,260.84. The net profits on the sales for those two months were $7,803.82 and $9,277.73. The sales by months during 1942 ranged from a low of $17,329.89 in February to a high of $43,985.49 in September. The petitioners expected the brake sales to continue to increase after March 1, 1943. The two individual petitioners, at a special meeting of the Board of Directors of the corporation held on March 1, 1943, adopted a resolution to distribute the brake patent as a dividend to themselves as stockholders. The patent was then worth at least $50,000. An assignment of an undivided one-half interest in the *201 patent to each of the two individuals was executed on that same day. A copy was recorded in the Patent Office. The two individuals and the corporation executed a "License Agreement" dated March 1, 1943, permitting the corporation to have the brakes manufactured and to sell them upon payment to the individuals of a royalty of 10 per cent of the gross receipts from the sale of the brakes and service and repair parts. The license was to be nonexclusive and was to continue until December 31, 1943, and thereafter was to be subject to termination at the end of any calendar year at the election of either party upon notice on or before December 1st of the year of termination. The two stockholders also executed an agreement on March 1, 1943 that on the death of either the survivor could purchase the other's interest in the patent for $10,000. The corporation, after March 1, 1943, paid amounts equivalent to 10 per cent of its annual gross receipts from its sales of magnetic brakes to the two individual petitioners. The corporation claimed deductions for the amounts as a part of the cost of "material or merchandise bought for manufacture or sale" and the individual petitioners reported them *202 as income from "patent royalty." The amounts paid for the ten months of 1943 and for the next four years were as follows: 1943
$33,853.56
1944
49,022.98
1945
54,083.30
1946
55,502.62
1947
53,743.82
The two individuals did not report on their returns for 1943 the receipt of any taxable dividends from the corporation and made no reference therein to the receipt of the patent. They did not claim on their returns for the taxable years any amortization deduction with respect to the patent. The Commissioner, in determining the deficiencies against the corporation, disallowed the deductions claimed for the payments to the two stockholders. The Commissioner, in determining the deficiencies against the individual petitioners, held that each had received a taxable dividend of $250,000 in 1943 from the distribution of the patent. The stipulation of the parties is incorporated herein by this reference. Opinion MURDOCK, Judge: Two men, a father and son, owned all of the stock of the petitioner corporation and caused it to transfer the patent to them as a dividend. Then, as a part of their integrated plan, they licensed the corporation to use the patent upon *203 payment to them of 10 per cent of its gross sales of the patented article. Transactions of that kind invite careful scrutiny for tax purposes to see whether they might result in disguised dividends. One inquiry is whether they had a business purpose beneficial to the corporation and, if not, whether they should be recognized. The transfer of the brake patent from the corporation to its sole stockholders did not serve the best interests of the corporation regardless of how desirable it might have been from the standpoint of the two stockholders. A large part of the business of the corporation was dependent upon the patent. The corporation needed the patent in its business but instead of retaining the patent in order to carry on that business with as little expense as possible, the two stockholders caused the corporation to distribute the patent to them and they charged the corporation for the continued use of the patent. The effect of the transfer was thus to increase the expenditures of the corporation and decrease the amount which it retained from sales of the brakes. The anticipated benefit from a tax deduction equivalent to the amount paid to the stockholders as so-called royalties *204 would be less than the concomitant reduction in profits of the corporation and the net result would be a detriment to the corporation. The corporation also lost control over the patent. The only real benefits mentioned or apparent from the transfer of the patent to the stockholders are benefits to the stockholders. Their tax on the 10 per cent would be the same whether they received it as a dividend or as royalties, but the corporation could not take a deduction for a dividend whereas it could take a deduction for the payment of a royalty. Thus, they thought they could receive a part of the gross sales at no extra cost to themselves but with a tax saving to the corporation. This would benefit them even though the corporation suffered. The two individual petitioners had at times considered the possibility of selling the corporation or merging it with one or two other corporations and the brake business under the patent would not have been desired by the other party or parties to any such transaction. One of the individual petitioners testified that one of the purposes of transferring the patent from the corporation to the stockholders was to get the patent out of the hands of the *205 corporation and into the hands of the stockholders so that it would not be lost to the stockholders in the case of any possible merger. The benefit there again is to the stockholders rather than to the corporation. That explanation would be more significant if a merger had been imminent or if a part or all of the brake business, instead of just the patent, had been taken away from the corporation to prepare effectively for a merger. He formerly explained that the transfer was made because the corporation had a profit-sharing pension plan which benefited its employees engaged in manufacturing its own products and the patent was transferred and a license given so that the employees would not benefit so much from profits from sales of the brakes which were not manufactured by them. However, the petitioners now concede that that could not have been a purpose for the transfer because the corporation had no profit-sharing pension plan at the time of the transfer. The record fails to show that the transfer served any business purpose of the corporation. It has been held that disguised transfers of earnings or dividends within a close family group or from a closely owned corporation to its *206 stockholder or stockholders are not recognized for tax purposes and do not create ordinary and necessary expenses of the business from which transferred. This case is not distinguishable in principle from a number of such prior cases although there are differences in the facts and, on authority of those cases, it is held that the corporation was not entitled to deduct the 10 per cent of its gross profits on the brakes as ordinary and necessary expenses of its business under section 23 (a) (1) (A). Those cases include , affirmed ; , affirmed ; and , certiorari denied , (4/21/52); cf , affirmed . The Court of Appeals for the Second Circuit in , distinguished , certiorari denied and its prior decision in upon which the *207 present petitioner relies. Those distinctions apply here also. Cases like , affirmed , and , , , are distinguishable because the patent on which royalities were paid in those cases never belonged to the corporation. Cases in which a part or all of a business was transferred from one taxable entity to another are distinguishable from this one in which the patent was transferred but the corporation continued the business under the patent. Cf. ; ; ; ; ; ; . The latter distinction is not without a real difference since a transfer of a part of a business relieves the transferor of important responsibilities *208 but the corporate operation was retained in the present case and the transfer burdened rather than relieved the corporation. No discussion of any other issue is necessary in view of the stipulation of the parties and the concession of the Commissioner based on a favorable decision of the point discussed above. Decisions will be entered under Rule 50.